Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>FRANK L. QUIÑONES BORIA<br><br>Apelante | KLAN202400665 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Fajardo<br><br>Sobre: Apelación Criminal<br><br>Casos Números: NSCR202300111, 00112, 00114, 00117 |
|---|---|---|

Panel integrado por su presidenta, la Juez Domínguez Irizarry, la Juez Grana Martínez y el Juez Pérez Ocasio

Domínguez Irizarry, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 18 de diciembre de 2025.

Comparece ante nos el apelante, el señor Frank L. Quiñones Boria (en adelante, apelante o señor Quiñones Boria), y nos solicita la revisión de la *Sentencia* dictada el 18 de junio de 2024, por el Tribunal de Primera Instancia, Sala de Fajardo. Mediante esta, el Foro Primario condenó al apelante a una pena de ciento veintinueve (129) años por infracción al Artículo 93 (b) del Código Penal de 2012, Ley Núm. 146-2012, 33 LPRA sec. 5142 (b), al Artículo 195 (a) del Código Penal, 33 LPRA sec. 5265, y al Artículo 6.05 y 6.14 (b) de la Ley de Armas de Puerto Rico, 25 LPRA sec. 466d y 466m.

Por los fundamentos que expondremos a continuación, se *confirma* la *Sentencia* apelada.

**I**

Por hechos ocurridos el 9 de enero de 2020, y tras acontecidos los procesos de rigor, el apelante fue acusado por

infracción al Artículo 93 (b) y 195 (a) del Código Penal, *supra,* los cuales tipifican los delitos de asesinato en primer grado, en su modalidad de asesinato estatutario, y escalamiento agravado. Del mismo modo, fue acusado por dos (2) cargos por infracción al Artículo 6.05 de la Ley de Armas, *supra,* el cual tipifica el delito de portación, transportación o uso de armas de fuego sin licencia, un (1) cargo por infracción al Artículo 6.09 de la Ley de Armas, 25 LPRA sec. 466h, el cual tipifica el delito de portación, posesión o uso ilegal de armas largas semiautomáticas, y tres (3) cargos por infracción al Artículo 6.14 (b) de la Ley de Armas, *supra,* el cual tipifica el delito de apuntar intencionalmente un arma de fuego hacia alguna persona. En específico, se le imputó que, el día en cuestión, actuó en concierto y acuerdo con Alexander Rodríguez Luna (en adelante, señor Rodríguez Luna), y Wilfredo Navarro Carrasquillo, también conocido como "Makuto" (en adelante Makuto), para dar muerte a Zamil Felipe Figueroa Jiménez, de forma ilegal, voluntaria, criminal e intencionalmente, al perpetrar el delito de escalamiento agravado, al penetrar en la casa ocupada por el perjudicado, provocando su muerte, utilizando un arma de fuego, tipo pistola de calibre 9 milímetros.

El juicio en su fondo correspondiente se celebró por tribunal de derecho los días 27, 29 y 30 de noviembre de 2023, 7 de diciembre de 2023, y 23 de febrero de 2024. Durante el mismo, se estipuló el testimonio de la madre del perjudicado, la señora Magaly Jiménez Rivera, para propósitos de la identificación del occiso.[1] El Ministerio Público presentó siete (7) testigos de cargo, así como la prueba documental y física.

A continuación, procedemos a resumir los aspectos pertinentes de la prueba testimonial.

---

[1] Transcripción de la Prueba Oral, págs. 12-13.

### Walberto Luis Rodríguez Maldonado[2]

Walberto Luis Rodríguez Maldonado (en adelante, señor Rodríguez Maldonado), declaró que, actualmente, ocupaba el puesto de examinador de armas de fuego en el Instituto de Ciencias Forenses (en adelante, ICF). Sin embargo, especificó, que para el 15 de enero de 2020, ejercía el puesto de técnico de control y custodia de evidencia. Testificó que, en la aludida fecha, el agente José E. Rivera Reyes (en adelante, agente Rivera Reyes) le entregó, en el ICF, veintiséis (26) proyectiles y sesenta y seis (66) casquillos, para la cual generó una *Solicitud de Servicio Forense* que fue admitida como Exhibit 1 del Ministerio Público. Explicó que su rol consistió en dividir las piezas de evidencia y entregárselas a la examinadora de armas de fuego, la señora Angélica María Resto Rivera (en adelante, señora Resto Rivera) para su análisis. A preguntas de la defensa, el señor Rodríguez Maldonado declaró que no tenía control sobre las pruebas que la señora Resto Rivera realizaba.

### Agente José E. Rivera Reyes[3]

El agente Rivera Reyes declaró que trabajaba para la Policía de Puerto Rico, en la Unidad de Servicios Técnicos del Cuerpo de Investigaciones Criminales (en adelante, CIC), desde el año 2011, y que su función consistía en auxiliar a sus compañeros en el manejo de escenas criminales. En lo concerniente al caso de epígrafe, testificó que, el 9 de enero de 2020, llegó a una residencia ubicada en la Calle Zafra, en el Barrio Jerusalén, en Fajardo, en donde vio casquillos en el exterior, cerca de la acera.[4] El agente Rivera Reyes indicó que, en el interior de la residencia, observó una persona muerta, boca abajo, sobre un sofá.[5] Describió que tomó fotos de la escena, las cuales fueron admitidas como Exhibits

---

[2] *Íd.*, págs. 15-24.
[3] *Íd.*, págs. 24-70
[4] *Íd.*, págs. 25-26.
[5] *Íd.*, pág. 26.

2A-2S del Ministerio Público, y destacó que en estas se podían apreciar los casquillos y derivados de proyectiles que fueron encontrados en la propiedad. En específico, sobre el Exhibit 2I expresó que se mostraban los casquillos enumerados en el suelo.[6] En cuanto a los Exhibits 2D y 2E, explicó que se observaba el cadáver boca abajo con varios impactos de bala en la espalda y en los brazos.[7] En el Exhibit 2F, indicó que se mostraba la sala, con el occiso sobre el sofá, al igual que los casquillos, derivados de proyectiles a su alrededor, un charco de sangre e impactos de bala en la pared.[8] Asimismo, mencionó que, en uno de los bolsillos del occiso, encontró prueba que confirmó la identidad del occiso como Zamil Felipe Figueroa Jiménez.[9]

Además, como parte de sus labores, el agente Rivera Reyes confeccionó un croquis de la escena, el cual fue admitido como Exhibits 3A-3D del Ministerio Público. Explicó que, en el croquis, identificó el lugar en el que ocupó la evidencia. Además, indicó que, si bien se hallaron casquillos y fragmentos de proyectiles en el exterior de la residencia, la mayor concentración de los mismos se encontraba dentro de la propiedad.[10] Igualmente, aseveró que las piezas recuperadas en el exterior correspondían a municiones de calibre 9 milímetros.[11] Señaló que, en el interior de la residencia, se encontraron casquillos de calibres 9 milímetros, .40, 5.56 y LC-18.[12] El agente Rivera Reyes afirmó que los casquillos de calibre 5.56 y LC-18 eran propios de un rifle.[13] Posterior a ello, testificó que ocupó la evidencia y, el 15 de enero de 2020, le entregó al señor Rodríguez Maldonado, en el ICF, un total de veintiséis (26) proyectiles y sesenta y seis (66) casquillos, lo que quedó

---

[6] *Íd.*, pág. 33.
[7] *Íd.*, pág. 38.
[8] *Íd.*, pág. 37.
[9] *Íd.*, pág. 39.
[10] *Íd.*, pág. 43.
[11] *Íd.*
[12] *Íd.*, págs. 44-48.
[13] *Íd.*, págs. 46-49.

consignado en la *Solicitud de Servicio,* entiéndase, el Exhibit 1 del Ministerio Público.

A preguntas de la defensa, el agente Rivera Reyes admitió que no identificó en el croquis los cinco (5) casquillos de calibre 5.56. Igualmente, aceptó que no podía determinar qué tipo de armas dispararon los casquillos encontrados en la escena. El agente Rivera Reyes aclaró que, dado a que el calibre 5.56 y el calibre LC-18 eran lo mismo, en realidad se habían encontrado tres (3) calibres en la escena.[14]

Posteriormente, a preguntas del Ministerio Público, el agente Rivera Reyes aclaró que, a pesar de no haber identificado los cinco (5) casquillos de calibre 5.56 en el croquis, según surge de las fotos tomadas, los marcó en la escena. Asimismo, reiteró que, a pesar de que no podía decir cuántas armas se dispararon, afirmó que se encontraron tres (3) calibres distintos. En el recontrainterrogatorio, el agente Rivera Reyes reconoció que no podía determinar si, en la comisión del delito, se utilizaron cuatro (4) armas.

### Carlos Alexis Serrano Vega[15]

El señor Carlos Alexis Serrano Vega (en adelante, señor Serrano Vega) declaró que, para enero del año 2020, vivía con su esposa e hijas en el Residencial Pedro Rosario Nieves, en Fajardo. Sostuvo que, para ese entonces, se dedicaba a la venta ilícita de drogas y armas de fuego. Se denominó como el armero del aludido Residencial, encargado de repartir las armas, las cuales guardaba en casa de su madre, ubicada en el Barrio Sardinero, en Fajardo. En el referido negocio ilícito, indicó que lo ayudaban las siguientes personas: el apelante, también conocido como "Real G"; el señor Rodríguez Luna, conocido como "Alex"; Makuto; Raúl Quiñones, conocido como "Bebo Grande"*;* y, Enrique, conocido como "Cheo".

---

[14] *Íd.*, pág. 57.
[15] *Íd.*, págs. 71-128.

En lo pertinente, el señor Serrano Vega declaró que, el 9 de enero de 2020, junto con Makuto, el señor Rodríguez Luna, y el apelante, acudieron a matar al señor Zamil Felipe Figueroa Jiménez, a quien describió como uno de sus enemigos.[16] Posteriormente, el testigo identificó al señor Rodríguez Luna y al apelante en corte abierta.[17] El señor Serrano Vega describió que, el día en cuestión, acudieron al Barrio Jerusalén, en Fajardo, en un vehículo Hyundai Elantra del año 2019, color negro, al cual le habían quitado los tapabocinas y cambiado la tablilla para "disfrazarlo". Según lo declarado por el señor Serrano Vega, él iba guiando, mientras que el apelante iba en el asiento del pasajero delantero, Makuto detrás del conductor, y el señor Rodríguez Luna a su lado derecho. Especificó que todos iban armados de la siguiente forma: Makuto tenía un rifle, el señor Rodríguez Luna tenía una Glock 22 de calibre .40, el apelante tenía una Glock 19 de calibre 9 milímetros, y el testigo tenía una Glock 26 de calibre 9 milímetros.[18]

Al llegar al Barrio Jerusalén, el señor Serrano Vega explicó que dieron una vuelta por el frente de la casa del perjudicado, en donde lo localizaron en el balcón. Indicó que, posteriormente, dieron una segunda vuelta, para entonces estacionar el vehículo. Relató que el apelante, el señor Rodríguez Luna y Makuto se bajaron armados del vehículo, mientras que él se mantuvo vigilando en el vehículo.[19] Posterior a ello, escuchó un *fuletazo* que describió como el tiro de un arma automática. Indicó que procedió a mover el vehículo, y vio que Gamaliel, un vecino del perjudicado, salió corriendo. Acto seguido, escuchó más detonaciones, y observó a Makuto, al apelante, y al señor Rodríguez Luna, salir de la casa del perjudicado con sus armas. Mientras que estos abordaban

---

[16] *Íd.*, pág. 73.
[17] *Íd.*, págs. 74-76.
[18] *Íd.*, pág. 80.
[19] *Íd.*, pág. 87.

nuevamente el vehículo, el señor Serrano Vega se mantuvo apuntando hacia la residencia por si aparecía otra persona. Luego, este disparó hacia la entrada de la casa con su Glock 26 automática de calibre 9 milímetros.

Acto seguido, el señor Serrano Vega señaló que el apelante le expresó lo siguiente: "aquí no ha pasado nada, cógelo suave".[20] Posterior a ello, se dirigieron a casa de su madre, en el Barrio Sardinera, para guardar las cuatro (4) armas utilizadas. Explicó que le colocaron los tapabocinas y le cambiaron nuevamente la tablilla al vehículo. Seguidamente, se fueron a dar una vuelta por Las Croabas, en Fajardo, para entonces, regresar al Residencial Pedro Rosario Nieves.

Del testimonio vertido en el contrainterrogatorio, se desprende que el señor Serrano Vega admitió su participación en la comisión de los hechos delictivos, así como que fue quien proveyó las armas a los demás involucrados. Asimismo, reiteró que, al momento de reinstalar los tapabocinas y la tablilla al vehículo, todos los participantes se encontraban presentes. Señaló, además, que el día de los sucesos, previo a la llegada a la referida residencia, había un vehículo de color verde frente a la misma. De igual forma, declaró que suscribió un acuerdo de cooperación en un caso distinto al del epígrafe, mediante el cual se le concedió una probatoria de diecisiete (17) años. No obstante, señaló que, en el caso de epígrafe, decidió hablar por cuenta propia.

Por su parte, a preguntas del Ministerio Público, el señor Serrano Vega reiteró que, al quitarle los tapabocinas al vehículo, estuvo acompañado por el apelante, el señor Rodríguez Luna y Makuto.[21] Aclaró que Juanjo condujo el vehículo verde, al igual

---

[20] *Íd.*, pág. 93, líneas 19-20.
[21] *Íd.*, pág. 121.

que fue el encargado de *setear* al perjudicado.[22]   Reiteró que al salir de la residencia, el apelante portaba una pistola de calibre 9 milímetros, el señor Rodríguez Luna tenía un arma de calibre .40, y Makuto tenía un rifle.[23] Igualmente, afirmó que conocía de las armas, porque él fue el encargado de guardarlas.[24]

Por último, en el recontrainterrogatorio, el señor Serrano Vega negó que, a pesar de que Juanjo se ocupó de notificarles si el perjudicado estaba en su casa, este no era parte de su ganga. Además, reiteró que, por su función como armero del Residencial, podía decir qué arma le proveyó a cada uno.

### Angélica María Resto Rivera[25]

La señora Resto Rivera, examinadora de armas de fuego del ICF, declaró que se encargó de examinar los sesenta y seis (66) casquillos y veintiséis (26) proyectiles y sus derivados relacionados al caso de epígrafe, cuyo *Certificado de Examen [...]* se admitió como Exhibit 4 del Ministerio Público. En específico, sobre el resultado número 1, testificó que ocho (8) de los proyectiles fueron disparados por la misma arma, pero no pudo determinar el calibre de estos.[26] Asimismo, en cuanto al resultado número dos (2), explicó que dieciocho (18) proyectiles, de los cuales doce (12) se recuperaron en el occiso, eran de calibre 9 milímetros y fueron disparados por una misma arma, pero distinta al resultado número uno (1).[27] Con relación al resultado número tres (3), señaló que dos (2) proyectiles recuperados en la escena, así como cinco (5) fragmentos de blindaje de proyectiles, eran de calibre 9 milímetros y se dispararon por una tercera arma, distinta a la de los resultados números uno (1) y dos (2).[28] Sobre el resultado número

---

[22] *Íd.*, pág. 122.
[23] *Íd.*, pág. 127.
[24] *Íd.*
[25] *Íd.*, págs. 128-172.
[26] *Íd.*, págs. 143-144.
[27] *Íd.*, págs. 147-148.
[28] *Íd.*, pág. 149.

cuatro (4), indicó que uno (1) de los proyectiles recuperado en el occiso, fue disparado por un arma distinta a las otras tres (3), pero que, debido a la mutilación de la pieza, no pudo determinar su calibre.[29] Acerca del resultado número cinco (5), declaró que dos (2) proyectiles fueron disparados por una arma de fuego, pero por sus características microscópicas, no se pudo determinar qué arma las disparó. Con respecto a los resultados números seis (6) al ocho (8), indicó que no tenían características suficientes para poder llevar a cabo una comparación.[30]

Ahora bien, en cuanto al resultado número nueve (9), la señora Resto Rivera declaró que treinta y siete (37) casquillos de calibre 9 milímetros fueron disparados por una misma arma de fuego.[31] Sobre el resultado número diez (10), mencionó que doce (12) casquillos de calibre 9 milímetros recuperados en la escena, se dispararon por una misma arma de fuego, distinta al resultado número nueve (9).[32] Con relación al resultado número once (11), testificó que siete (7) casquillos de calibre .40 recuperados en la escena se dispararon por una tercera arma de fuego, distinta a los resultados números nueve (9) y diez (10).[33] Acerca del resultado número doce (12), declaró que nueve (9) casquillos de calibre .223 Remington, equivalente al calibre 5.56, fueron recuperados en la escena, y disparados por una misma arma.[34]

Por último, la señora Resto Rivera concluyó que en la escena se dispararon un mínimo de cuatro (4) armas, hasta un máximo de ocho (8).[35] Asimismo, las piezas que analizó la señora Resto Rivera se admitieron como el Exhibit 5 del Ministerio Público. A preguntas

---

[29] *Íd.*, págs. 150-151.
[30] *Íd.*, págs. 152-156.
[31] *Íd.*, pág. 156.
[32] *Íd.*, págs. 157-158.
[33] *Íd.*, págs. 158-159.
[34] *Íd.*, págs. 159-160.
[35] *Íd.*, pág. 162.

de la defensa, la señora Resto Rivera declaró que no examinó armas de fuego en este caso.

### Agente José A. Quiñones Scott[36]

El agente José A. Quiñones Scott (en adelante, agente Quiñones Scott) declaró que, para el 9 de enero de 2020, laboraba, desde las 8:00am hasta las 4:00pm, para el CIC de la Policía de Puerto Rico, en la Unidad de Homicidios. Testificó que, el día en cuestión, se recibió una llamada al 911, a las 6:37pm, reportando unas detonaciones en el Barrio Jerusalén, en Fajardo. No obstante, aclaró que fue al día siguiente en que se le asignó el caso de epígrafe y comenzó su investigación. De este modo, indicó que, el 10 de enero de 2020, se reunió con el agente Rivera Reyes, quien le mostró la prueba que ocupó el día de los hechos y las fotografías que tomó en la escena. Explicó que, en estas, observó que hubo un total de sesenta y seis (66) casquillos, de los cuales cincuenta (50) eran de calibre 9 milímetros, nueve (9) de calibre 223, y siete (7) de calibre .40. Igualmente, en las fotos observó al occiso, boca abajo, con múltiples heridas de bala.

Así las cosas, el agente Quiñones Scott declaró que recibió una llamada del agente Raúl Velázquez Paz, quien se encontraba investigando otros hechos que ocurrieron en el Residencial Puerto Real. Este le informó que el señor Serrano Vega quería hablar con él sobre el caso de epígrafe. En consecuencia, el 1 de octubre de 2020, el agente Quiñones Scott lo entrevistó.

El señor Serrano Vega le explicó que condujo el Hyundai Elantra, cuatro puertas, color negro, con tapabocinas, que se utilizó para ir a darle muerte al señor Zamil Felipe Figueroa Jiménez.[37] Le manifestó que conocía al perjudicado desde hacía

---

[36] *Íd.*, págs. 172-228.
[37] Cabe señalar que se admitió como el Exhibit 6 del Ministerio Público, las *Advertencias Miranda [...]* que firmó el señor Serrano Vega, el 1 de octubre de 2020. Asimismo, se admitió como el Exhibit 7 del Ministerio Público, otras *Advertencias Miranda [...]* que el referido testigo firmó, el 16 de junio de 2022.

muchos años. Le explicó que, en el Residencial Pedro Rosario Nieves estuvo acompañado por Makuto, el apelante y el señor Rodríguez Luna, y que allí, en conjunto, planificaron darle muerte al perjudicado.[38] El agente Quiñones Scott identificó al apelante y al señor Rodríguez Luna en corte abierta.[39]

El agente Quiñones Scott relató que el testigo le indicó que enviaron a Juanjo, en un vehículo Suzuki Vitara, color verde, para que verificara si el perjudicado se encontraba en su residencia, en el Barrio Jerusalén. Explicó que, tanto el apelante y el señor Serrano Vega, iban armados con una pistola de calibre 9 milímetros,[40] mientras que el señor Rodríguez Luna estaba armado con una pistola de calibre .40 y Makuto con un rifle. Al llegar a la propiedad, estos ubicaron al perjudicado en el balcón de su casa. Dieron una segunda vuelta, luego de la cual el señor Serrano Vega se estacionó. Acto seguido, Makuto, el apelante y el señor Rodríguez Luna, se bajaron del vehículo armados.[41] Estos caminaron por la acera, añangotados, hasta la residencia del perjudicado. Posterior a ello, el señor Serrano Vega le indicó que escuchó un *fuletazo* de un arma automática, y vio que Gamaliel salió corriendo. Luego, le expresó que vio a Makuto, al señor Quiñones Boria y al señor Rodríguez Luna, salir de la propiedad.[42] Además, el señor Serrano Vega le indicó que disparó hacia la casa, y que el apelante le expresó que lo cogiera con calma.[43] Según le señaló Serrano Vega, al culminar, guardaron las referidas armas en casa de su madre, en el Barrio Sardinera, y se dirigieron a Las Croabas.

El agente Quiñones Scott declaró que, además de entrevistar a Gamaliel, entrevistó a múltiples vecinos que le informaron haber

---

[38] Transcripción de la Prueba Oral, pág. 194.
[39] *Íd.*
[40] *Íd.*, pág. 195.
[41] *Íd.*, págs. 198-199.
[42] *Íd.*, pág. 200.
[43] *Íd.*, págs. 200-201.

visto un vehículo de color oscuro, cuatro puertas, y un vehículo color verde, pasar por el área el día de los hechos. Igualmente, señaló que obtuvo los visuales de unas cámaras de seguridad ubicadas en la calle posterior a la casa del perjudicado, en los cuales observó que, a las 6:37pm, pasaron unos vehículos con la descripción provista por los vecinos entrevistados, así como a una persona que salió corriendo.[44] De este modo, y en conjunto con el informe de balística del ICF y la prueba ocupada, el agente Quiñones Scott aseveró que corroboró la versión ofrecida por el señor Serrano Vega. Igualmente, verificó que ninguno de los involucrados tenía licencia para portar armas de fuego.

A preguntas de la defensa, el agente Quiñones Scott reiteró que, según lo informado por el señor Serrano Vega, el apelante utilizó una pistola de calibre 9 milímetros, el señor Rodríguez Luna una pistola de calibre .40, y Makuto, un rifle.[45] Sin embargo, aceptó que, de las notas que hicieron en el año 2020, no surgía el modelo de cada arma. Asimismo, aclaró que los involucrados le quitaron los tapabocinas al vehículo, previo a cometer los hechos, y que se los colocaron nuevamente, tan pronto culminaron. Igualmente, indicó que, en la comisión del delito, participaron dos (2) vehículos: "en el vehículo verde lo *setean* y en el vehículo negro lo matan".[46] Además, aceptó que el señor Serrano Vega cooperó en la investigación de múltiples asesinatos, y que desconocía si se le había acusado por alguno de ellos.

### Doctora Irma Rivera Diez[47]

La patóloga forense, la doctora Irma Rivera Diez (en adelante, doctora Rivera Diez), declaró que le realizó la autopsia al occiso en el caso de epígrafe, cuyo *Informe Médico – Forense* se admitió como Exhibit 8 del Ministerio Público. Testificó que recibió

---

[44] *Íd.*, págs. 202-203.
[45] *Íd.*, pág. 223.
[46] *Íd.*, pág. 226.
[47] *Íd.*, págs. 230-252.

el cadáver de un varón de tez trigueña, cuyo cuerpo presentaba distorsión de las características faciales por trauma de heridas de bala. Manifestó que el cuerpo reflejó treinta y nueve (39) heridas de proyectiles, de las cuales treinta y cinco (35) penetraron la superficie corporal, con dirección de atrás hacia adelante, y dieciocho (18) se ubicaron en el área de la cabeza.[48] Además, concluyó que la causa de muerte fueron las múltiples heridas de proyectil, por homicidio, en su acepción forense, entiéndase, a mano de otro u otras personas.[49]

Así las cosas, y culminado el desfile de prueba, el 18 de junio de 2024, el Tribunal de Primera Instancia dictó la *Sentencia* apelada, mediante la cual condenó al apelante a ciento veintinueve (129) años de reclusión, en específico el Foro de Instancia le impuso una pena de noventa y nueve (99) años por el delito de asesinato en primer grado, en la modalidad de asesinato estatutario, el cual se tipifica en el Artículo 93(b) del Código Penal, y ocho (8) años por escalamiento agravado, codificado en el Artículo 195 del Código Penal, *supra*, a ser cumplidos concurrentemente. Asimismo, lo sentenció a diez (10) años, duplicados a veinte (20), por portar un arma de fuego sin licencia, el cual se tipifica en el Artículo 6.05 de la Ley de Armas, *supra*, y cinco (5) años, duplicados a diez (10), por disparar o apuntar armas de fuego, codificado en el Artículo 6.14 (b) de la Ley de Armas, *supra*, a ser cumplidos consecutivamente con los otros delitos.

El Foro Primario declaró no culpable al señor Rodríguez Luna por el delito de asesinato en primero grado. No obstante, condenó al coacusado a una pena de reclusión de ocho (8) años por infringir el Artículo 195 del Código Penal, *supra*, así como a

---

[48] *Íd.*, pág. 232.
[49] *Íd.*, pág. 244.

cinco (5) años por violación al Artículo 6.06 de la Ley de Armas, *supra,* y un (1) año por el Artículo 6.14 de la misma Ley, *supra,* a ser cumplidas de forma consecutiva entre sí*.*

Inconforme, el 4 de agosto de 2025, el apelante presentó el recurso de epígrafe ante nos. En el mismo, señala la comisión de lo siguientes errores:

> Erró el Honorable Tribunal de Primera Instancia al encontrar culpable al Apelante a base de una prueba que no estableció su culpabilidad más allá de duda razonable. El Ministerio Público no probó todos los elementos de los delitos contenidos en las acusaciones más allá de duda razonable.
>
> Erró el Honorable Tribunal de Primera Instancia al encontrar culpable, con la misma prueba, al Apelante, quien estaba acusado del delito de asesinato, según el testimonio del Ministerio Público, actuando en concierto y común acuerdo con el acusado Alexander Rodríguez Luna, quien resultó absuelto de dicho delito, en el caso NSCR202300103.
>
> Erró el TPI al aplicar el Agravamiento de las Penas al amparo del Art. 7.03 de la Ley de Armas, en violación al derecho del Apelante a la adecuada notificación de los cargos en su contra, en violación al debido proceso de ley y la Constitución de Puerto Rico.

Por su parte, el 10 de septiembre de 2025, el Procurador presentó el *Alegato [del] Pueblo de Puerto Rico.* Así, perfeccionado el recurso y con el beneficio de la comparecencia de ambas partes, así como la transcripción estipulada de la prueba oral y los autos originales, procedemos a resolver las cuestiones planteadas.

## II

### A

La Constitución del Estado Libre Asociado de Puerto Rico dispone que, en todo proceso de naturaleza criminal, el acusado de delito se presume inocente hasta tanto no se pruebe, de manera satisfactoria, su culpabilidad. Artículo II, Sección 11, Constitución de Puerto Rico, 1 LPRA. La *presunción de inocencia* constituye una de las máximas principales en el sistema de ley y orden vigente, por lo que, para ser rebatida, el sistema de derecho impone al

gobierno el deber de cumplir con un *quantum* de prueba más allá de duda razonable*,* como carga probatoria requerida en su quehacer de encausar toda conducta amenazante a la seguridad pública. *Pueblo v. Toro Martínez,* 200 DPR 834, 855-856 (2018); *Pueblo v. Santiago et al.,* 176 DPR 133, 142 (2009).

El deber del Estado no puede ser descargado livianamente. En este contexto, es premisa reiterada que el deber de cumplir con el quantum requerido no se alcanza sólo presentando prueba meramente suficiente en cuanto a todos los elementos del delito que se imputa a determinado ciudadano. La prueba debe ser, además, satisfactoria, es decir, que produzca la certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. *Pueblo v. Toro Martínez,* pág. 856; *Pueblo v. García Colón I,* 182 DPR 129, 174-175 (2011). Es así como se estima que la duda razonable no es una duda especulativa o imaginaria, así como tampoco cualquier vacilación posible. *Pueblo v. Irizarry,* 156 DPR 780, 788 (2002); *Pueblo v. Feliciano Rodríguez,* 150 DPR 443, 447 (2000) (Sentencia); *Pueblo v. Rosario Reyes,* 138 DPR 591, 598 (1995). *Duda razonable* es aquella que surge como producto del raciocinio de todos los elementos de juicio involucrados en el caso. En consecuencia, para que se justifique la absolución de un acusado, este aspecto probatorio debe ser el resultado de la consideración serena, justa e imparcial de la totalidad de la evidencia del caso, o de la falta de suficiente prueba en apoyo a la acusación. Así pues, la duda razonable no es otra cosa que la insatisfacción de la conciencia del juzgador con la prueba presentada. *Pueblo v. Irizarry,* supra, pág. 788.

De manera reiterada, nuestro Tribunal Supremo ha afirmado que la determinación de si se probó, o no, la culpabilidad del acusado a la luz de la referida carga probatoria es revisable en

apelación, ello dado a que la apreciación de la prueba desfilada en un juicio es un asunto combinado de hecho y derecho. *Pueblo v. Irizarry*, supra, pág. 788; *Pueblo v. Acevedo Estrada*, 150 DPR 84, 100 (2000). Sin embargo, la estimación de la prueba corresponde al foro sentenciador, razón por la cual los tribunales apelativos sólo intervendrán con ella cuando concurran las circunstancias que legitimen su labor, o cuando la evidencia misma no concuerde con la realidad fáctica del caso, resultando ser inherentemente imposible. *Pueblo v. Irizarry*, supra, pág. 789.

Es premisa reiterada en nuestro ordenamiento jurídico que, en ausencia de pasión, prejuicio, error manifiesto o parcialidad, los tribunales intermedios no habrán de intervenir con la apreciación y la adjudicación de credibilidad de la prueba que realizan los tribunales de instancia. *Pueblo v. Apolinar Rondón*, 2025 TSPR 113, 216 DPR __ (2025); *Pueblo v. Hernández Doble*, 210 DPR 850, 864 (2022); *Pueblo v. Rodríguez Pagán,* 182 DPR 239, 259 (2011). Como norma, un tribunal apelativo está impedido de sustituir o descartar, por sus propias apreciaciones, las determinaciones de hecho que realiza el foro sentenciador, fundamentando su proceder en un examen del expediente sometido a su escrutinio. S*errano Muñoz v. Auxilio Mutuo,* 171 DPR 717, 741 (2007); *Rolón v. Charlie Car Rental, Inc.,* 148 DPR 420, 433 (1999). Asimismo, las determinaciones de credibilidad que realiza el tribunal primario están revestidas de una presunción de corrección, razón por la cual, en este aspecto, gozan de un amplio margen de deferencia por parte del foro intermedio. *Pueblo v. Hernández Doble,* supra, pág. 864*; Pueblo v. Toro Martínez*, supra, pág. 857.

De ordinario, el Tribunal de Primera Instancia es quien está en mejor posición para aquilatar la prueba testifical que ante sí se presentare, puesto que es quien oye y observa declarar a los testigos. *Pueblo v. Apolinar Rondón,* supra; *Pueblo v. Negrón*

*Ramírez,* 213 DPR 895, 910 (2024); *Pueblo v. Toro Martínez,* supra, págs. 857-858; *Pueblo v. Bonilla Romero,* 120 DPR 92, 111 (1987). En este sentido, el juzgador de hechos goza de preeminencia al poder apreciar sus gestos, contradicciones, manierismos, dudas y vacilaciones, oportunidad que le permite formar en su conciencia la convicción de si dicen, o no, la verdad. *Pueblo v. Cruz Rosario,* 204 DPR 1040, 1057-1058 (2020); *Pueblo v. Toro Martínez,* supra, págs. 857-858; *Pueblo v. De Jesús Mercado,* 188 DPR 467, 478 (2013) (Sentencia); *Pueblo v. García Colón I,* supra, pág. 165.

Ahora bien, la normativa antes expuesta no es de carácter absoluto. Una apreciación incorrecta de la prueba tampoco ostenta inmunidad frente a la función revisora del tribunal apelativo. Si bien el arbitrio y la discreción del foro primario es respetable, sus dictámenes están sujetos a que los mismos se emitan conforme a los principios de legalidad y justicia. *Pueblo v. Hernández Doble,* supra, pág. 865.

Por otra parte, conforme lo establecido por el ordenamiento probatorio vigente:

> [l]a juzgadora o el juzgador de hechos deberá evaluar la evidencia presentada con el propósito de determinar cuáles hechos han quedado establecidos o demostrados, con sujeción a los principios siguientes:
>
> [...]
>
> (d) La evidencia directa de una persona testigo que merezca entero crédito, es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley.
>
> [...]
>
> Regla 110 de Evidencia, 32 LPRA Ap. VI, R. 110.

En reiteradas ocasiones, nuestro sistema de derecho ha reconocido que el testimonio de un solo testigo, cuando éste pretende declarar sobre un hecho, es suficiente para que el mismo quede establecido. *Pueblo v. Chévere Heredia,* 139 DPR 1, 15 (1995). Asimismo, nuestro Máximo Foro ha expresado que "el

testimonio de un testigo principal, por sí solo, de ser creído, es suficiente en derecho para sostener un fallo condenatorio". *Pueblo v. Toro Martínez*, supra, pág. 860.

**B**

En lo pertinente, en el Artículo 92 del Código Penal de 2012, 33 LPRA sec. 5142, define el delito de *asesinato* como "dar muerte a un ser humano a propósito, con conocimiento o temerariamente". A tenor con la conducta antes descrita y a fin de exponer los *grados de asesinato* reconocidos en nuestro ordenamiento penal, el Artículo 93 (a) del Código Penal reza de la siguiente manera:

Constituye asesinato en primer grado:

> (a) Todo asesinato perpetrado por medio de veneno, acecho, tortura, estrangulamiento, sofocación o asfixie posicional, o a propósito o con conocimiento.
> (b) Todo asesinato causado al perpetrarse o intentarse algún delito de incendio agravado, agresión sexual, robo, **escalamiento agravado**, secuestro, secuestro de un menor, estrago (excluyendo la modalidad negligente), envenenamiento de aguas de uso público (excluyendo la modalidad negligente), agresión grave, fuga, maltrato (excluyendo la modalidad negligente), abandono de un menor; maltrato, maltrato agravado, maltrato mediante restricción de la libertad, o agresión sexual conyugal, según contemplados en la Ley Núm. 54 de 15 de agosto de 1989, según enmendada, conocida como la "Ley para la Protección e Intervención de la Violencia Doméstica".

> [...].

> 33 LPRA sec. 5142. (Énfasis suplido).

Relativo a lo dispuesto en el referido inciso del antes esbozado artículo, sabido es que el mismo hace referencia al entendido normativo del *asesinato estatutario*. Conforme al ordenamiento penal vigente, el mismo provee para que una persona pueda ser responsabilizada por asesinato en primer grado, si causare la muerte a otra, al perpetrar o intentar perpetrar alguno de los delitos expresamente enumerados en la disposición en cuestión.

Por otro lado, el Artículo 194 del Código Penal, 33 LPRA sec. 5264, tipifica el delito de *escalamiento*. A tales fines, expresamente dispone que:

> Toda persona que penetre en una casa, edificio u otra construcción o estructura, o sus dependencias o anexos, con el propósito de cometer cualquier delito de apropiación ilegal o cualquier delito grave, incurrirá en delito grave y será sancionada con pena de reclusión por un término fijo de tres (3) años.

Ahora bien, si la conducta delictiva antes expuesta se cometiere en un *edificio ocupado*, o en cualquier otro lugar en el cual la víctima tenga una expectativa razonable de intimidad, el Artículo195 del referido Código, 33 LPRA sec. 5265, establece que se configura el delito de *escalamiento agravado*, clasificándose el mismo como uno de naturaleza grave, con una pena fija de ocho (8) años de reclusión. Para efectos de esta disposición, un edificio ocupado comprende, entre otros aspectos, toda casa, estructura, vehículo o lugar adaptado para acomodo nocturno de personas, siempre que esté en uso, con independencia de que, al momento del hecho, no haya personas presentes. Esta definición comprende, por igual, sus anexos, dependencias y el solar donde esté enclavado. 33 LPRA sec. 5014 (p). Conforme lo antes expuesto, es preciso colegir que, para que se considere cometido el delito de escalamiento agravado, es necesaria la concurrencia y simultaneidad entre la intención específica de delinquir por parte del sujeto activo y la penetración al lugar de que trate, según descrito en la norma aplicable. *Pueblo v. Reyes Bonilla,* 100 DPR 265, 267 (1971); *Pueblo v. Soriano Rodríguez,* 92 DPR 46, 48 (1965); *Pueblo v. Rosado,* 78 DPR 436, 441 (1955).

Por su parte, la Segunda Enmienda de la Constitución de Estados Unidos le garantiza a todo ciudadano el derecho a tener y portar armas. Enmienda II, Const. EE. UU., LPRA, Tomo 1. No obstante, el mismo es limitado, por lo que el Estado puede

regularlo. *Pueblo v. Meléndez Monserrate,* 214 DPR 547, 570 (2024). A tenor con lo anterior, y en virtud de balancear dicho derecho y su reglamentación, se aprobó la *Ley de Armas de Puerto Rico de 2020*, Ley Núm. 168 de 11 de diciembre de 2019, 25 LPRA, sec. 461 *et seq.*

En cuanto a lo que nos respecta, el Artículo 6.05 la Ley de Armas, Ley Núm. 168-2019, 25 LPRA 466d, dispone, en lo aquí pertinente, que toda persona que porte, transporte o use cualquier arma de fuego sin tener la licencia correspondiente para ello, incurrirá en un delito grave y de resultar convicta será sancionada con pena de reclusión por un término fijo de diez (10) años. Además, el referido Artículo contempla la variación del término de esta pena fija establecida entre un intervalo de un mínimo de cinco (5) años y un máximo de veinte (20) años de mediar circunstancias agravantes. En específico, "se considerará un 'agravante' cualquier situación en la que el arma ilegal se utilice en la comisión de cualquier delito o su tentativa". *Íd.*

A su vez, el Artículo 6.14 del antedicho estatuto, 25 LPRA 466m, regula la conducta proscrita con relación a apuntar o disparar un arma. En concreto, este artículo dispone lo siguiente:

> Incurrirá en delito grave con pena de reclusión por un término fijo de cinco (5) años, toda persona que, salvo en casos de legítima defensa, propia o de terceros, o de actuaciones en el legítimo desempeño de funciones oficiales o actividades legítimas de deportes:
>
> (a) voluntariamente dispare cualquier arma de fuego fuera de los lugares autorizados por esta Ley, aunque no le cause daño a persona alguna; o
>
> (b) intencionalmente apunte hacia alguna persona con un arma de fuego, aunque no le cause daño a persona alguna.
>
> De mediar circunstancias agravantes, la pena establecida podrá ser aumentada hasta un máximo de diez (10) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de un (1) año. *Íd.*

Precisa destacar que, conforme dispone el estatuto en cuestión, todas las penas de reclusión que bajo sus términos se impongan, habrán de cumplirse consecutivamente entre sí, así como con las impuestas al amparo de cualquier otro precepto legal. Del mismo modo, cuando se usare un arma de fuego en la comisión de cualquier delito y, como resultado de dicho acto se le ocasionara daño físico a una persona, la pena correspondiente se duplicará. En específico, el Artículo 6.01 de la Ley de Armas, 25 LPRA sec. 466, reza:

> Toda persona que resulte convicta de alguna de las disposiciones de esta Ley, y que dicha convicción esté asociada y sea coetánea a otra convicción de cualquiera de las disposiciones de la Ley Núm. 4 de 23 de junio de 1971, según enmendada, conocida como la "Ley de Sustancias Controladas de Puerto Rico", con excepción del Artículo 404 de la misma, o de la Ley Núm. 33 de 13 de julio de 1978, según enmendada, conocida como la "Ley contra el Crimen Organizado y Lavado de Dinero del Estado Libre Asociado de Puerto Rico", será sancionada con el doble de la pena provista en esta Ley. Todas las penas de reclusión que se impongan bajo esta Ley serán cumplidas consecutivamente entre sí y consecutivamente con las impuestas bajo cualquier otra ley. Además, si la persona hubiere sido convicta anteriormente por cualquier violación a esta Ley o por cualquiera de los delitos especificados en ésta o **usare un arma en la comisión de cualquier delito y como resultado de tal violación, alguna persona sufriera daño físico o mental, la pena establecida para el delito se duplicará**. Toda violación a esta Ley en una zona escolar o universitaria conllevará el doble de la pena.
>
> […]. (Énfasis nuestro).

El referido Artículo obliga al juez sentenciador a duplicar la pena dispuesta para el delito imputado, una vez contemplados los posibles agravantes y atenuantes. Ese efecto duplicador surge del interés del legislador de penalizar severamente las infracciones a la Ley de Armas, *supra*. *Pueblo v. Concepción Guerra*, 194 DPR 291, 311 (2015). Bajo este precepto, nuestro ordenamiento jurídico no exige que se le aperciba al acusado de la posibilidad de una duplicación en la pena, pues basta con que se prueben, más allá de duda razonable, los elementos contemplados en dicho Artículo.

**III**

En el caso de autos, el apelante alegó que el Tribunal de Primera Instancia erró al dictar una sentencia condenatoria en su contra, ya que arguyó que el Ministerio Público incumplió con la carga probatoria requerida para establecer su culpabilidad. Del mismo modo, planteó que el Foro de Instancia estaba impedido de absolver al coacusado, el señor Rodríguez Luna, por el asesinato en primer grado, con la misma prueba con la que condenó al apelante. Por último, sostuvo que el Foro *a quo* erró al duplicar la pena por los delitos bajo la Ley de Armas, *supra,* tras argumentar que no se le notificó de dicha posibilidad en la acusación. Habiendo atendido los referidos señalamientos a la luz de los hechos acontecidos y de la norma aplicable, resolvemos *confirmar* el dictamen apelado.

Por estar relacionados entre sí, discutiremos los primeros dos (2) errores en conjunto. El apelante arguyó que no se probaron, más allá de duda razonable, los delitos imputados, y que el dictamen era contradictorio. En específico, sostuvo que la prueba del Ministerio Público se centró en el testimonio del señor Serrano Vega, y que el Juzgador lo otorgó credibilidad al mismo. No obstante, este Tribunal está convencido de que el testimonio del señor Serrano Vega, junto a toda la prueba admitida que corrobora el mismo, es más que suficiente para establecer, más allá de duda razonable, la culpabilidad del apelante en todos los delitos por los cuales fue acusado. Veamos.

Según se desprende de la transcripción de los procedimientos, el testimonio del señor Serrano Vega vinculó directamente al apelante con la comisión de los hechos delictivos objeto de autos. En particular, este declaró que el 9 de enero de 2020, el apelante, junto a Makuto y al señor Rodríguez Luna, actuaron en concierto y común acuerdo con el propósito de dar

muerte al señor Zamil Felipe Figueroa Jiménez. A tales efectos, explicó que estos colaboraron en la preparación del vehículo que se utilizó para trasladarse hasta el Barrio Jerusalén, lugar de residencia del perjudicado. Igualmente, el señor Serrano Vega declaró que le entregó al apelante una Glock 19 de calibre 9 milímetros, a Makuto un rifle y al señor Rodríguez Luna una Glock 22 de calibre .40. A su vez, el testigo indicó que él llevaba una Glock 26 de calibre 9 milímetros. Indicó que, una vez en el Barrio Jerusalén, dieron una primera vuelta para localizar a la víctima en el balcón de su residencia y que, en la segunda vuelta, decidieron estacionarse. Relató que el apelante, acompañado por el señor Rodríguez Luna y Makuto, se bajó del vehículo armado. Posterior a ello, el testigo declaró que escuchó múltiples detonaciones y que, poco después, observó al apelante salir de la referida propiedad, aún armado, en compañía de Makuto y del señor Rodríguez Luna.

Dicho testimonio fue corroborado con la prueba admitida en el juicio. En específico, el agente Quiñones Scott corroboró la información que este le brindó. Específicamente, declaró que, en los visuales de las cámaras de seguridad, observó el vehículo descrito, tanto por los vecinos entrevistados, como por el señor Serrano Vega, pasar por la propiedad del perjudicado en el día y hora de los hechos delictivos. Asimismo, testificó que la prueba ocupada en la escena, las fotografías allí tomadas y el informe de balística, eran congruentes con la versión de los hechos que el señor Serrano Vega declaró.

Del mismo modo, surge del croquis admitido en evidencia, al igual que de las fotografías y del testimonio del agente Rivera Reyes, que en la escena se encontraron múltiples casquillos, proyectiles y sus derivados, de calibre 9 milímetros, tanto en el interior de la propiedad, como en sus áreas exteriores. Del testimonio del señor Serrano Vega emana que, de las tres (3)

personas que ingresaron a la propiedad, únicamente el señor Quiñones Boria portaba un arma de calibre 9 milímetros. Por tanto, la información que refleja el croquis sobre el interior de la residencia corrobora que, en efecto, un arma de calibre de 9 milímetros fue disparada dentro de la misma. Igualmente, la evidencia recopilada en el exterior de la residencia valida lo declarado por el testigo, en cuanto a que este disparó hacia el frente de la aludida propiedad antes de abandonar la escena.

Asimismo, surge del testimonio de la señora Resto Rivera, examinadora de armas de fuego del ICF, que del cuerpo del occiso se recuperaron doce (12) proyectiles de calibre 9 milímetros, los cuales fueron disparados por una misma arma de fuego. Además, identificó cinco (5) fragmentos de blindaje correspondientes a proyectiles del mismo calibre que provenían de un arma distinta. De igual forma, estableció que treinta y siete (37) casquillos de calibre 9 milímetros fueron disparados por una sola arma, mientras que otros doce (12) casquillos, también de calibre 9 milímetros, correspondían a un arma diferente. A ello se suma la ocupación de siete (7) casquillos de calibre .40 y nueve (9) de calibre 5.56. Este cuadro probatorio coincide plenamente con el testimonio del señor Serrano Vega y demuestra que, en efecto, se utilizaron las armas de fuego que este identificó como las portadas por él, el apelante, el señor Rodríguez Luna y Makuto, el día de los hechos.

A la luz de lo antes expuesto, no podemos sino concluir que la prueba vertida en el juicio demostró de forma clara y contundente que el apelante, en efecto, perpetró los delitos imputados. A nuestro juicio, los testimonios ofrecidos en evidencia, debidamente corroborados con prueba física e ilustrativa, demuestran claramente la participación del apelante en la comisión de los hechos imputados. Es por ello que concluimos que

el Ministerio Público probó, más allá de duda razonable, que el apelante actuó en concierto y común acuerdo con el señor Rodríguez Luna y Makuto, para dar muerte al señor Zamil Felipe Figueroa Jiménez, a propósito, y con conocimiento, utilizando un arma de fuego. Además, se demostró que, para lograr su objetivo, el apelante penetró a la propiedad del perjudicado, entiéndase un edifico ocupado. Por ende, somos del criterio de que el Ministerio Público probó, más allá de duda razonable, la concurrencia de todos los elementos constitutivos de los delitos imputados.

En mérito de lo anterior, no encontramos error, prejuicio o parcialidad por parte del Juzgador de hechos que legitime nuestra intervención en el asunto. A la luz de los documentos ante nos sometidos, así como la transcripción de los procedimientos, es menester concluir que la *Sentencia* apelada está debidamente apoyada por la prueba evaluada, y, por consiguiente, el referido dictamen no es contradictorio[50].

Por último, respecto a su *tercer señalamiento de error*, el referido Artículo 6.01 de la Ley de Armas, *supra*, obliga al juez sentenciador a duplicar la pena cuando la persona convicta haya utilizado un arma en la comisión de un delito y como consecuencia alguien haya sufrido un daño físico o mental.[51] Ese efecto duplicador, el cual aplica a la violación de cualquiera de las disposiciones de dicho estatuto, surge del interés del legislador de penalizar severamente las infracciones a sus disposiciones.

---

[50] Podríamos especular que el Foro de Instancia absolvió al señor Rodríguez Luna del delito de asesinato en primer grado por razón de que no surge de la prueba, ni de los testimonios vertidos en el juicio, que se hubiesen encontrado proyectiles de calibre .40 dentro del cuerpo. No obstante, estamos convencidos de que dicha absolución no fue como consecuencia de que el testimonio del señor Serrano Vega no mereciera credibilidad, ni es contradictorio como plantea el apelante.

[51] Cabe resaltar que el apelante hace alusión al Artículo 7.03 de la derogada Ley de Armas de Puerto Rico, Ley Núm. 404 del 11 de septiembre de 2000, 25 LPRA ant. sec. 460b. No obstante, surge del expediente que el apelante fue acusado al amparo de la Ley Núm. 168 del 11 de diciembre de 2020, según enmendada, 25 LPRA sec. 461 *et seq.*

En el caso de epígrafe, la evidencia demostró que el apelante le causó un daño físico, entiéndase la muerte, al señor Zamil Felipe Figueroa Jiménez mediante el uso de un arma de fuego. Por ello, el Foro de Instancia encontró probados los elementos del delito de los cuales surge el agravante establecido en el Artículo 6.01 de la Ley de Armas, *supra*. Ante tal hecho, es mandatorio que las penas por las infracciones a la Ley de Armas, *supra*, sean duplicadas. Por ello, concluimos que las penas que impuso el Juzgador de los hechos equivalen al cómputo que exige la Ley. Nótese que es por virtud de una disposición de ley que, una vez probados los elementos que de allí se desprenden, corresponde el aumento en la condena. Nuestro ordenamiento jurídico no exige que, ante este escenario, se le aperciba de esta posibilidad al apelante. Por consiguiente, concluimos que el tercer señalamiento de error tampoco se cometió.

En fin, en ausencia de criterio legal alguno que nos permita sustituir el juicio empleado en la causa de epígrafe mediante el ejercicio de las funciones que nos fueron delegadas, *confirmamos* la sentencia impuesta.

**IV**

Por los fundamentos anteriormente esbozados, se *confirma* la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones